# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KT4 PARTNERS LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 2017-0177-JRS** |
| | : | |
| PALANTIR TECHNOLOGIES, INC. | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted:  December 12, 2017
Date Decided:  February 22, 2018

Bartholomew J. Dalton, Esquire and Andrew C. Dalton, Esquire of Dalton & Associates, P.A., Wilmington, Delaware and Barry S. Simon, Esquire and Jonathan B. Pitt, Esquire of Williams & Connolly LLP, Washington, DC, Attorneys for Plaintiff.

Blake Rohrbacher, Esquire, Kevin M. Gallagher, Esquire and Kelly L. Freund, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Kevin J. Orsini, Esquire and Rory A. Leraris, Esquire of Cravath, Swaine & Moore LLP, New York, New York, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Actions to enforce a stockholder's right to demand inspection of a corporation's books and records under Section 220 of the Delaware General Corporation Law ("Section 220") are summary proceedings, until they aren't.[1]  This Section 220 action has been anything but summary.

In 2003, Marc Abramowitz invested in a new company called Palantir Technologies, Inc. ("Palantir" or "Defendant"), through one of his investment vehicles, Plaintiff, KT4 Partners LLC ("KT4" or "Plaintiff").  Initially, Abramowitz enjoyed a close relationship with executives at Palantir.  That changed, however, after senior Palantir executives accused Abramowitz of misappropriating Palantir trade secrets.  Soon after the falling out, on August 16, 2016, Abramowitz (through KT4) requested information from Palantir under the parties' Investors' Rights Agreement (the "IRA").  KT4 did not respond.

Two weeks later, on September 1, 2016, Palantir sued Abramowitz for theft of trade secrets in California state court.  On September 20, 2016, KT4 supplemented its request for information under the IRA with a formal demand for inspection under Section 220.  In its demand, KT4 stated that its purpose for inspection was "to investigate fraud, mismanagement, abuse, and breach of fiduciary duty by [Palantir], its officers, its directors, its agents, and its majority

---

[1] 8 *Del. C.* § 220.

shareholders." On September 28, 2016**,** Palantir responded with a formal rejection of KT4's demand. KT4 filed its Verified Complaint Against Defendant Palantir Technologies, Inc. for Inspection of Books and Records Pursuant to 8 *Del. C.* § 220 (the "Complaint") approximately six months later, on March 8, 2017.

When it became clear during discovery that Plaintiff intended to build his case for inspection on hearsay, double hearsay and, at times, triple hearsay, the Court was drawn into protracted *in limine* motion practice to determine the bounds of the admissible trial evidence.[2] At trial, Abramowitz previewed at length a tortious interference with contract or prospective business relations case he intends to bring against principals and associates of Palantir, while Palantir was eager to lay out its misappropriation of trade secrets against Abramowitz. When the Court questioned whether the investigation of Abramowitz's personal tortious interference claim, or his defense of a misappropriation claim, were proper subjects of a Section 220 trial, KT4 responded in its post-trial submissions and arguments

---

[2] While this court generally will consider hearsay evidence in Section 220 proceedings, there are limits to how far the court will extend this allowance. *See, e.g.*, *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 710 (Del. Ch. 1995) (rejecting plaintiff's suspicions of mismanagement that were premised on the company's former employee's statements as hearsay that was not "sufficiently reliable to create a *credible* inference of waste and mismanagement") (emphasis in original), *aff'd*, 681 A.2d 1026 (Del. 1996); *Haque v. Tesla Motors, Inc.*, 2017 WL 448594, at *7 (Del. Ch. Feb. 2, 2017) (rejecting excerpts from an unauthorized biography as "classic hearsay" that did not satisfy any applicable hearsay exception); *Mattes v. Checkers Drive-In Rests., Inc.*, 2001 WL 337865, at *2 n.2 (Del. Ch. Mar. 28, 2001) ("This hearsay testimony proffered by plaintiff himself cannot create a credible inference of mismanagement.").

by focusing on other aspects of the demand where it identified more conventional purposes for inspection. As discussed below, that strategic pivot was well founded and supported by the evidence when viewed under the "credible basis" standard of proof.

After carefully reviewing the evidence presented at trial and the arguments of counsel, I conclude in this post-trial Memorandum Opinion that KT4 has demonstrated, by a preponderance of the evidence, a proper purpose of investigating potential wrongdoing and a credible basis to justify further investigation into three areas: (1) Palantir's serial failures to hold annual stockholder meetings, (2) Palantir's IRA amendment in 2016 and (3) Palantir's compliance with its stockholder agreements. Judgment is entered for KT4. Palantir shall produce for inspection the books and records designated herein as essential to KT4's pursuit of its proper purpose of investigating this possible wrongdoing.

## I. FACTUAL BACKGROUND

Trial of this matter occurred on June 28, 2017, with live testimony from Abramowitz. The Court received one lodged deposition and 325 trial exhibits. The parties presented post-trial arguments on December 12, 2017. I have drawn the facts from admitted allegations in the pleadings, stipulated facts, trial testimony and

exhibits along with those matters of which the Court may take judicial notice.[3]

Unless otherwise indicated, the following facts were proven by a preponderance of the evidence. I assign the evidence the weight and credibility I find it deserves in accordance with my post-trial motion *in limine* ruling, which I incorporate herein.

## A. The Parties and Relevant Non-Parties

Plaintiff KT4 is a Delaware limited liability company and Marc Abramowitz is its managing member.[4] KT4 is the record holder of 5,696,977 shares of Palantir common and preferred stock.[5]

Defendant Palantir is a privately held Delaware corporation with its principal place of business in Palo Alto, California.[6] Non-party Alexander Karp is Palantir's co-founder and CEO.[7] Karp and Abramowitz know each other through a nonprofit organization where Karp was an employee and Abramowitz served as a board member.[8]

---

[3] Citations to the Pre-Trial Stipulation and Order are "PTO ¶ [ ]," to the joint exhibits at trial are "JX #" and to the trial transcript are "Tr. #."

[4] PTO ¶ 3.

[5] JX 194 (Palantir Stocklist, Dated January 31, 2017) at 222. Palantir does not dispute that KT4 is and has been a stockholder at all relevant times.

[6] PTO ¶ 2; JX 183 (Answer to Complaint) at 9.

[7] JX 183 (Answer to Complaint) at 39.

[8] Tr. 27–28.

4

Non-party Disruptive Technology Advisers LLP ("DTA") is allegedly Palantir's broker.[9]  Non-party Brooklands Capital Strategies ("Brooklands") is a division of TPG Capital.[10]  Brooklands allegedly represents the interests of a Chinese entity identified by the parties as CDH.[11]  In 2015, KT4 attempted to sell its entire Palantir position to CDH indirectly through Brooklands.[12]

## B. KT4 Invests in Palantir

In approximately 2003, after a meeting with Karp, Abramowitz made an initial investment of $100,000 in Palantir (through KT4).[13]  Thereafter, KT4 made several more investments in Palantir to a point where Abramowitz estimates KT4's current Palantir holdings are worth at least $60 million.[14]  Abramowitz was a trusted advisor to Palantir and was afforded unique access to Palantir's executives.[15]  Over the course of fifteen years as a Palantir investor, Abramowitz visited Palantir at least

[9] Tr. 53.

[10] JX 89 (E-mail) at 4214; Tr. 56.

[11] *Id.*

[12] Tr. 55–56.

[13] Tr. 28.

[14] JX 182 (Complaint) ¶ 1.

[15] Tr. 118–121; JX 183 (Answer to Complaint) at 1; Pl. KT4 P'rs LLC's Post-Trial Br. ("Pl.'s Post-Trial Opening Br.") 13.

a dozen times.[16]  Abramowitz met with Karp almost every time he visited Palantir,[17] and the two maintained a cordial and amicable relationship.[18]  During this time, Abramowitz did not make formal requests for information from Palantir, presumably because he was in regular contact with Palantir executives.[19]  As discussed below, Abramowitz's unique access to Palantir ended after a phone call with Karp in the summer of 2015.[20]

### C. Palantir's Stockholder Agreements

In connection with KT4's investments in Palantir, KT4 and Palantir executed the IRA dated June 15, 2006 (the "June 2006 IRA") and the Amended IRA dated February 15, 2008 (the "February 2008 IRA").[21]  Palantir and certain investors (excluding KT4) entered into an Amended and Restated IRA dated July 8, 2015 (the "July 2015 IRA").[22]  The July 2015 IRA was amended in two separate

---

[16] Tr. 118.

[17] Tr. 118–19.

[18]  Tr. 88.

[19] Tr. 132–33.

[20] Tr. 121–22.

[21] JX 183 (Answer to Complaint) at 12; JX 6 (February 2008 IRA).  JX 3 appears to be an unexecuted version of the June 2006 IRA.  Palantir does not dispute the authenticity of JX 3; therefore, I treat JX 3 as a true and correct copy of the June 2006 IRA.  *See* Def. Palantir Techs. Inc.'s Post-Trial Br. ("Def.'s Post-Trial Opening Br.") 11 (including JX 3 in a list identifying various stockholder agreements).

[22] JX 183 (Answer to Complaint) at 7; JX 87 (July 2015 IRA).

documents, both dated September 1, 2016 (individually, the "September 2016 IRA Amendment-A" and "September 2016 IRA Amendment-B," and together, the "September 2016 IRA Amendments").[23]

The IRA (as amended and restated from time to time) grants Major Investors, including KT4, a right of first offer ("ROFO") with respect to future stock offerings by Palantir.[24] Specifically, Section 2.4 of the IRA provides that if Palantir seeks to offer shares of its stock to new investors, it must first provide notice and an opportunity to Major Investors to participate in the offering in proportion to the investor's ownership of certain Palantir stock, or beyond its ownership proportion in the event shares designated for the offering are not all sold to existing or new investors.[25]

The June 2006 IRA and February 2008 IRA define Major Investor as an investor that holds at least 500,000 shares of Registrable Securities.[26] The July 2015 IRA, however, executed without KT4's involvement, re-defined Major

---

[23] JX 183 (Answer to Complaint) at 7; JX 165 (September 2016 IRA Amendment-A); JX 166 (September 2016 IRA Amendment-B).

[24] JX 3 (June 2006 IRA) § 2.4; JX 6 (February 2008 IRA) § 2.4; JX 87 (July 2015 IRA) § 2.4. "Major Investor" is defined in the respective stockholder agreements at § 2.1.

[25] JX 3 (June 2006 IRA) § 2.4; JX 6 (February 2008 IRA) § 2.4; JX 87 (July 2015 IRA) § 2.4.

[26] JX 3 (June 2006 IRA) § 2.1; JX 6 (February 2008 IRA) § 2.1. "Registrable Securities" is defined in the respective stockholder agreements at § 1.1(g).

Investor as an investor that holds at least five million shares of Registrable Securities.[27] The September 2016 IRA Amendment-A increased the Major Investor threshold once again, this time to ten million shares of Registrable Securities.[28] Under the September 2016 IRA Amendment, KT4's 5,696,977 shares of Palantir stock fails to meet the Major Investor threshold required to qualify for the ROFO.

Aside from implicating who receives the ROFO, the Major Investor definition also affects stockholders' right to request information from Palantir. Only Major Investors can request access to, and "inspection" of, Palantir's financial information as defined in the IRA.[29] After the September 2016 IRA Amendment-

---

[27] JX 87 (July 2015 IRA) § 2.1. "Registrable Securities" is defined in JX 87 § 1.1(k).

[28] JX 165 (September 2016 IRA Amendment-A) ¶ 1. Palantir relied on IRA Section 3.7 to enact the September 2016 IRA Amendments. IRA Section 3.7 states, in relevant part:

> Section 2.1, Section 2.2, Section 2.3 and Section 2.4 may be amended or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of [Palantir] and the holders of a majority of the Registrable Securities that are held by Major Investors.

JX 3 (June 2006 IRA) § 3.7; JX 6 (February 2008 IRA) § 3.7; JX 87 (July 2015 IRA) § 3.7. IRA Section 3.7 does not require Palantir to give notice to investors for amendments to Sections 2.1 through 2.4, and expressly states that any amendment or waiver under IRA Section 3.7 is binding upon each holder of Registrable Securities, each future holder of such Registrable Securities and Palantir. JX 3 (June 2006 IRA) § 3.7; JX 6 (February 2008 IRA) § 3.7; JX 87 (July 2015 IRA) § 3.7.

[29] JX 3 (June 2006 IRA) §§ 2.1, 2.2; JX 6 (February 2008 IRA) §§ 2.1, 2.2; JX 87 (July 2015 IRA) §§ 2.1, 2.2. "Inspection" includes the right "to visit and inspect [Palantir's] properties, to examine its books of account and records and to discuss [Palantir's] affairs, finances and accounts with its officers . . ." JX 3 (June 2006 IRA) §§ 2.1, 2.2; JX 6 (February 2008 IRA) §§ 2.1, 2.2; JX 87 (July 2015 IRA) §§ 2.1, 2.2.

A changed the Major Investor threshold above KT4's holdings, KT4 lost its contractual right to request Palantir's information or seek inspection.[30]

The September 2016 IRA Amendment-B restricts a Major Investor's access to information in two additional ways. First, it permits Palantir to deny a request for Palantir's financial information or inspection if Major Investors holding a certain percentage of Registrable Securities and Palantir consider the request to be made in bad faith or for an improper purpose.[31] Second, specific to Major Investors' inspection rights, the September 2016 IRA Amendment-B states that Palantir is not obligated to provide access to any information that it "reasonably considers to be a trade secret or similar confidential information."[32]

In addition to the IRA, Palantir executed First Refusal and Co-Sale Agreements ("FRCSA") with its investors, including KT4. Specifically, Palantir and KT4 executed a FRCSA dated June 15, 2006 (the "June 2006 FRCSA") and the Amended and Restated FRCSA dated February 5, 2008 (the "February 2008 FRCSA").[33] Several years later, Palantir and certain investors (excluding KT4)

---

[30] JX 165 (September 2016 IRA Amendment-A) ¶ 1.

[31] JX 166 (September 2016 IRA Amendment-B) ¶ 1(a).

[32] JX 166 (September 2016 IRA Amendment-B) ¶ 1(b).

[33] JX 183 (Answer to Complaint) at 17–18; JX 7 (February 2008 FRCSA). JX 1 appears to be an unexecuted version of the June 2006 FRCSA. Palantir does not dispute the authenticity of this version of the June 2006 FRCSA; therefore, I treat JX 1 as a true and

entered into the Amended and Restated FRCSA dated July 8, 2015 (the "July 2015 FRCSA").[34] The FRCSA gives Palantir a right of first refusal ("ROFR") when specific investors (each a "Selling Investor" and together, the "Selling Investors")[35] seek to sell Palantir stock.[36] The FRSCA also gives certain investors ("Investors"), including KT4, a ROFR (second to Palantir's ROFR)[37] and a co-sale right.[38] The ROFR and co-sale mechanism operates such that Palantir has the first option to purchase any or all of the block of shares that a Selling Investor seeks to sell, then the Investors get the option to purchase their pro rata share of the unsold shares within the block.[39] If shares remain unsold after Palantir and the Investors have

---

correct copy of the June 2006 FRCSA. *See* Def.'s Post-Trial Opening Br. 11 (including JX 1 in a list of stockholder agreements).

[34] JX 86 (July 2015 FRCSA).

[35] The Selling Investors are five individuals (including Karp) under the June 2006 FRCSA and the February 2008 FRCSA. JX 1 (June 2006 FRCSA) at 1; JX 7 (February 2008 FRCSA) at 1. Under the July 2015 FRCSA, the Selling Investors are holders of Class A common stock and/or Class B common stock as identified on the July 2015 FRCSA Schedule A, which includes the aforementioned five individuals. JX 86 (July 2015 FRCSA) at 1, § 2.1(b), Schedule A. KT4 is not a Selling Investor.

[36] JX 1 (June 2006 FRCSA) § 2.1; JX 7 (February 2008 FRCSA) § 2.1; JX 86 (July 2015 FRCSA) § 2.1.

[37] JX 1 (June 2006 FRCSA) § 2.1; JX 7 (February 2008 FRCSA) § 2.1; JX 86 (July 2015 FRCSA) § 2.1.

[38] JX 1 (June 2006 FRCSA) § 2.2; JX 7 (February 2008 FRCSA) § 2.2; JX 86 (July 2015 FRCSA) § 2.2.

[39] JX 1 (June 2006 FRCSA) §§ 2.1, 2.2; JX 7 (February 2008 FRCSA) §§ 2.1, 2.2; JX 86 (July 2015 FRCSA) §§ 2.1, 2.2.

exercised their ROFR, subject to notice requirements, an Investor may sell a percentage of its stock equal to the Investor's pro rata share of the unsold shares of the block.[40]

Under the June 2006 FRCSA and February 2008 FRCSA, ROFO and co-sale rights do not apply for the first 500,000 shares that a Selling Investor seeks to sell.[41] The July 2015 FRCSA changed that provision to state that ROFO and co-sale rights do not apply to transfers by Selling Investors that are "approved by a disinterested majority of the Board of Directors of [Palantir]" and do not exceed the exemption levels identified in Schedule B.[42] Karp has zero shares exempted from transfer restrictions.[43]

---

[40] JX 1 (June 2006 FRCSA) § 2.2; JX 7 (February 2008 FRCSA) § 2.2; JX 86 (July 2015 FRCSA) § 2.2.

[41] JX 1 (June 2006 FRCSA) § 2.4; JX 7 (February 2008 FRCSA) § 2.4.

[42] JX 86 (July 2015 FRCSA) § 2.4. Section 10 of the June 2006 FRCSA and February 2008 FRCSA provides the agreement may be amended and the observance of any term of the agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of [Palantir], the Founders (as defined in the respective agreements) holding at least a majority of the common stock and Investors holding at least a majority of the common stock. JX 1 (June 2006 FRCSA) § 10; JX 7 (February 2008 FRCSA) § 10. Section 10 further provides "that in the event such amendment or waiver materially and adversely affects the obligations or rights of any Investor in a different manner than the other Investors, such amendment or waiver shall also require the written consent of such materially and adversely affected Investor." JX 1 (June 2006 FRCSA) § 10; JX 7 (February 2008 FRCSA) § 10.

[43] JX 86 (July 2015 FRCSA) § 2.4, Schedule B.

## D. KT4's Efforts to Sell Palantir Stock to Brooklands

In the summer of 2015, KT4 and Palantir's relationship was fractured after Abramowitz received a phone call from Karp during which Karp "verbally abused [him] in a manner that [he] thought was irrational, somewhat unhinged, and completely contradictory to any relationship [he] had had with [Karp] in the past."[44] During this conversation, Karp accused Abramowitz of stealing Palantir's intellectual property.[45] Following this conversation, Abramowitz sought to sell his entire Palantir position to Brooklands.[46] Abramowitz teamed up with other Palantir stockholders who also sought liquidity because Brooklands was interested in purchasing more Palantir shares than Abramowitz had to sell.[47] According to Abramowitz, Brooklands did not go through with the transaction because principals at Palantir got wind of the deal and offered Brooklands new shares instead.[48]

---

[44] Tr. 11.

[45] Tr. 11, 121.

[46] Tr. 55–56.

[47] Tr. 56–57; JX 109 (E-mail). In keeping with my September 5, 2017 bench ruling on Palantir's motion *in limine*, where applicable, I note the parties' evidentiary objections and my ruling when referencing certain exhibits or testimony. During that hearing, I ruled that certain E-mails concerning various transactions would be inadmissible hearsay if offered for the truth of the matter asserted. To the extent those documents are cited in this Memorandum Opinion, they are cited only for some non-truth purpose. Mot. *in Limine* Tr. 72–74 (Sept. 5, 2017).

[48] Tr. 70.

Following the unsuccessful transaction with Brooklands, Abramowitz consulted with attorneys to explore a tortious interference suit against Palantir for blocking the sale of KT4's shares to Brooklands.[49]

### E. KT4 Requests Information and Inspection Pursuant to the February 2008 IRA

After Abramowitz's attempt to sell KT4's entire Palantir position to Brooklands failed, on August 16, 2016, KT4 sent Palantir an information request pursuant to the February 2008 IRA (the "Information Request").[50] Notably, at the

---

[49] Tr. 129–30.

[50] JX 163 (KT4's Information Request). Relying on Section 2.1 of the February 2008 IRA, KT4 requested that Palantir produce: (1) year-end financial reports for each fiscal year from 2011 through 2015; (2) unaudited income statement, statement of cash flows and unaudited balance sheet as of September 30, 2016; (3) a budget and business plan for fiscal year 2017 and (4) any notice sent to investors pursuant to February 2008 IRA subsection 2.4(a) from February 2008 through present day. *Id.* at 1–2. In addition to its production request, pursuant to Section 2.2 of the February 2008 IRA, KT4 requested inspection of Palantir's books of account and records and a meeting with Palantir's Chief Executive Officer ("CEO"), Chief Operating Officer, Chief Financial Officer and Chief Technology Officer about various topics. *Id.* The discussion topics included: (1) Palantir's financial performance; (2) compensation of Palantir's officers and directors; (3) travel and expense records/reports for expenses incurred by Palantir's officers and directors; (4) all communications, meetings, discussions, and conversations over the last five years regarding dividends and an initial public offering ("IPO") of Palantir stock; (5) concerns and complaints from stockholders about their ability *vel non* to sell their Palantir stock; (6) the reasons underlying Palantir's decision over the last five years to repurchase Palantir common stock; (7) agreements concerning nondisclosure, confidentiality, interactions with the press, and/or litigation releases entered into in connection with Palantir's repurchase of common stock; (8) each actual and potential offering or sale by anyone of shares of Palantir stock during the last five years; (9) whether, how, and to what extent Palantir or its common holders complied with Section 2.4(a) of the February 2008 IRA; (10) commissions or payments made to DTA and (11) Palantir's practices and polices concerning sales of Palantir shares. *Id.* at 2–3.

13

time of the Information Request, KT4 still had information rights under the IRA because its Palantir holdings were sufficient to allow it to qualify as a Major Investor.[51] Palantir wrote to KT4 on August 21, 2016, stating that it was reviewing the request and would respond soon.[52] When Palantir did not respond, KT4 reiterated its request on August 30, 2016.[53]

### F. Palantir Amends the July 2015 IRA and Files a California Lawsuit

Palantir did not respond to KT4's Information Request. Instead, on September 1, 2016, Palantir executed the September 2016 IRA Amendments,[54] and then, on that same day, filed a lawsuit against KT4 in the Superior Court of the State of California, alleging, *inter alia*, misappropriation of Palantir's trade secrets (the "California Action").[55]

---

[51] The investment threshold was not raised beyond KT4's holdings until September 2016. JX 165 (September 2016 IRA Amendment-A) ¶ 1.

[52] JX 164 (E-mail Chain).

[53] *Id.*

[54] JX 183 (Answer to Complaint) at 7; JX 165 (September 2016 IRA Amendment-A); JX 166 (September 2016 IRA Amendment-B). Palantir asserts that "the September 2016 IRA Amendments were among the ways that Palantir sought to fulfill its obligations to its other stockholders and protect itself from [] Abramowitz's misuse of sensitive business information." JX 183 (Answer to Complaint) at 41.

[55] JX 167 (Complaint in California Action).

## G. KT4 Makes a Section 220 Demand

On September 20, 2016, KT4 sent a Books and Records Demand (the "Demand") to Palantir seeking 22 categories of documents (individually, "Request [#]", and collectively, the "Requests").[56] KT4 stated its purpose in making the Demand was "to investigate fraud, mismanagement, abuse, and breach of fiduciary duty committed by [Palantir], its officers, its directors, its agents, and its majority shareholders" relating to the following issues: (1) interference with KT4's efforts to sell its Palantir shares; (2) Palantir's practice of improperly favoring certain stockholders; (3) corporate waste; (4) Palantir's actions that deprived certain investors of the full value of their investments; (5) Palantir's actions that deprived certain investors of their ROFR to purchase Palantir shares

---

[56] The Demand is similar, but not identical, to the Information Request. The Demand asks for: (a) Requests 1–2: Palantir's stock ledger and list of stockholders; (b) Requests 3–4: identification of directors and officers, and their dates of service; (c) Request 5: board of director and sub-committee minutes; (d) Requests 6–7, 15: financial statements and other books and records regarding the value of Palantir's equity; (e) Requests 8–9: officer and director compensation and Karp's travel and expense reports; (f) Requests 10–11, 13, 14, 18, 21 and 22: Palantir's share repurchase(s), any actual or potential sales of Palantir shares effectuated by Palantir or its stockholders, Palantir's "practices and policies" concerning sales of Palantir shares, notice sent to Palantir investors regarding a sale of Palantir shares, offers or potential offers to purchase Palantir stock, any agreement or proposed agreement to permit Karp to sell or dispose of his Palantir shares and books and records relating to whether certain stockholders are favored to the detriment of others; (g) Request 12: payments made to DTA; (h) Requests 16–17: books and records regarding dividends and an IPO of Palantir stock; (i) Request 19: books and records relating to the September 2016 IRA Amendments and (j) Request 20: books and records relating to each Palantir annual stockholder meeting. JX 170 (Demand) at 1–3. Most of these Requests are qualified by "all" or "any" and span a time range of approximately 2011 through the present. *Id.*

and (6) securities fraud.[57]  Of note, KT4's demand did not raise either valuation or communicating with other stockholders as purposes supporting the Demand.[58] On September 28, 2016, Palantir rejected the Demand on four grounds: (1) Abramowitz's primary purpose is improper; (2) the Demand fails to set forth a credible basis from which to infer mismanagement or breach of duty; (3) KT4 did not articulate what it intends to do with the information it seeks; and (4) KT4 did not show that specific documents are necessary and essential to KT4's stated purpose.[59]

KT4 did not amend its Demand to address Palantir's objections.  Instead, on March 8, 2017, six months after serving its Demand, KT4 filed the Complaint in this Court.[60]  In its Complaint, KT4 alleges its purpose for asserting inspection rights is "to allow KT4 to investigate whether and to what extent Palantir . . . [has] prevented disfavored investors such as KT4 from realizing the value of their investment."[61]  The Complaint also restates the six issues that KT4 seeks to

---

[57] JX 170 (Demand) at 4.

[58] *See* JX 170 (Demand).

[59] JX 171 (Palantir's Demand Rejection Letter) at 2.

[60] PTO ¶ 8; JX 182 (Complaint).

[61] JX 182 (Complaint) ¶ 3.

investigate identified in the Demand.[62]  Importantly, however, where the Demand

did not state a valuation purpose, the Complaint states that KT4 seeks to inspect

books and records to value its Palantir stock holdings.[63]

## H.  Palantir Offers KT4 Some Books and Records

Prior to KT4 filing the Complaint, Palantir offered to produce certain books

and records in response to the Demand.[64]  Palantir renewed its offer during the

pendency of this litigation.[65]  First, on February 14, 2017, Palantir offered KT4:

> (i) [Palantir's] most recent audited consolidated financial statements
> of operations, comprehensive loss, changes in convertible preferred
> stock and stockholders' deficit and cash flows for the years then ended,
> and the related notes to the consolidated financial statements and
> (ii) [Palantir's] summary capitalization table as of a recent date,
> aggregated by share class and series.[66]

---

[62] *Id.* ¶ 88.

[63] *Id.* ¶ 87.

[64] JX 122 (Palantir's First Offer to Produce Books and Records).

[65] JX 193 (Palantir's Second Offer to Produce Books and Records).  I do not view these exchanges as offers to compromise, and neither party has suggested that their dialogue to address the Demand pre- and post-litigation would be inadmissible under Delaware Uniform Rules of Evidence 408.

[66] JX 122 (Palantir's First Offer to Produce Books and Records).

Palantir conditioned its offer on KT4's agreement to execute Palantir's Non-Disclosure Agreement.[67] KT4 rejected Palantir's offer on February 22, 2017.[68]

On April 26, 2017, one month after KT4 filed its Complaint, Palantir again offered KT4 books and records to resolve this litigation.[69] Specifically, Palantir offered six categories of documents responsive to the Demand:

- a list of Palantir stockholders (Request 2);

- a list of all directors and officers, and their dates of service, from 2011 through the present (Requests 3 and 4);

- Palantir's audited consolidated financial statements for the years ended December 31, 2014 and December 31, 2015, the most recent audited statements available (Request 6);

- the July 2015 IRA and the September 2016 IRA Amendments (Request 22); and

- the FRCSA, as amended and restated (Request 22).[70]

---

[67] Id.

[68] JX 123 (E-mail) at 1.

[69] JX 193 (Palantir's Second Offer to Produce Books and Records).

[70] Id. at 1.

18

Palantir again conditioned its offer on KT4 executing a "standard Section 220 confidentiality stipulation."[71]  On May 2, 2017, KT4 again rejected Palantir's offer, disagreeing that the proposed books and records represent a "complete response to each of the referenced demands" and stating that Palantir's proposed confidentiality stipulation is "not appropriate or reasonable."[72]  Palantir has not produced books and records in response to KT4's Demand, but has produced a stocklist and the September 2016 IRA Amendments as discovery in this litigation.[73]

## II. ANALYSIS

Section 220 permits a stockholder of a corporation to inspect the corporation's books and records for any proper purpose.[74]  The stockholder bears the burden of proof to demonstrate a proper purpose for each item sought by a preponderance of the evidence.[75]  A plaintiff seeking inspection must also prove that each category of the books and records requested is essential to fulfill the stated

---

[71] *Id.* at 1, 3–11.

[72] JX 195 (KT4's Rejection of Palantir's Second Offer to Produce Books and Records) at 1.

[73] JX 165 (September 2016 IRA Amendment-A); JX 166 (September 2016 IRA Amendment-B); JX 194 (Palantir's Stocklist, Dated January 31, 2017).

[74] 8 *Del. C.* § 220.

[75] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).  The burden of proof rests with the corporation to demonstrate an improper purpose when resisting demands to inspect stocklists and stock ledgers.  8 *Del. C.* § 220(c).

purpose.[76]  A proper purpose is one that is reasonably related to the stockholder's interests as a stockholder.[77]

The stockholder's purpose must be a means to some end.[78]  Stated differently, the stockholder "must do more than state, in a conclusory manner, a generally accepted proper purpose."[79]  A reason for the purpose must also be stated, *i.e.*, what the stockholder will do with the information it seeks, or an end to which its demand may lead.[80]  "Further, once a proper purpose has been established, any secondary purpose or ulterior motive of the stockholder becomes irrelevant."[81]

KT4 contends that two overarching purposes can be extracted from its lengthy Demand:  valuing its shares and investigating wrongdoing.  For the reasons that follow, I find KT4 has failed properly to advance a valuation purpose but has properly stated a purpose to investigate possible wrongdoing (albeit not to the extent alleged).

---

[76] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[77] 8 *Del. C.* § 220(b).

[78] *W. Coast Mgmt. & Capital, LLC, v. Carrier Access Corp.*, 914 A.2d 636, 646 (Del. Ch. 2006).

[79] *Id.*

[80] *Id.*

[81] *CM & M Gp., Inc. v. Carroll*, 453 A. 2d 788, 792 (Del. 1982).

## A. The Valuation Purpose

It is settled Delaware law that a desire to value one's stock is a proper purpose for inspection under Section 220.[82] To advance that purpose, or any purpose, Section 220 requires that a stockholder follow certain steps in making its demand to inspect books and records, including that the stockholder clearly state the purpose(s) for its desired inspection.[83] Indeed, our Supreme Court has made clear that "[a] Section 220 plaintiff's compliance with the statutorily mandated procedures is a precondition to having the propriety of its purpose for inspection

---

[82] *Id.* (citing *State ex rel. Rodgers v. Sherman Oil Co.*, 117 A. 122, 125 (Del. Super. Ct. 1922)). *See also Thomas & Betts Corp.*, 685 A.2d at 713 ("Valuation of a stockholder's investment in a corporation, particularly where the corporation is privately held, has long been recognized as a proper purpose under 8 *Del. C.* § 220. Because they do not receive the mandated, periodic disclosures associated with a publicly held corporation, minority shareholders in a privately held corporation face certain risk. Such shareholders may, therefore, have a legitimate need to inspect the corporation's books and records to value their investment, in order to decide whether to buy additional shares, sell their shares, or take some other action to protect their investment.") (citation omitted).

[83] *Seinfeld v. Verizon Commc'ns, Inc.*, 873 A.2d 316, 317 (Del. Ch. 2005), *aff'd*, 909 A.2d 117 (Del. 2006); 8 *Del. C.* § 220(b) ("Any stockholder . . . shall, upon written demand under oath *stating the purpose thereof* . . . to inspect for any proper purpose . . .") (emphasis added). *See also* 8 *Del. C.* § 220(c) ("Where the stockholder seeks to inspect the corporation's books and records, other than its stock ledger or list of stockholders, such stockholder shall first establish that: . . . (2) Such stockholder has complied with this section respecting the form and manner of making demand for inspection of such documents.").

addressed."[84] KT4 failed to state its valuation purpose in the Demand, and there are consequences for this deficiency.[85]

KT4 argues that notwithstanding the "quibble over the wording,"[86] the Court should find that the Demand states a valuation purpose for any of three reasons. First, the Demand requests Palantir's year-end financial statements, quarterly financial statements, and internal valuations; therefore, Palantir should have been able to discern that valuation was one of KT4's purposes in making the Demand.[87] Second, any doubt over the wording of the Demand should be resolved in favor of KT4's statutory right to inspection.[88] Finally, if the Demand lacked specificity about KT4's valuation purpose, any arguable technical deficiency was cured when KT4 stated that purpose in its Complaint.[89]

---

[84] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 141 (Del. 2012). *See also Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *7 (Del. Ch. May 14, 2014) ("To satisfy Section 220's procedural requirements, *i.e.*, its 'form and manner' requirements, demand must be made in writing, under oath, and must state the stockholder's purpose for making it.").

[85] *See* JX 170 (Demand).

[86] Pl. KT4 P'rs LLC's Post-Trial Reply Br. ("Pl.'s Post-Trial Reply Br.") 12.

[87] Pl.'s Post-Trial Opening Br. 25–26.

[88] *Id.*

[89] *Id.*

In response, Palantir points out the obvious; the Demand makes absolutely no mention of valuation as a proffered purpose. Rather, the only identified purposes are investigative purposes. [90] Palantir further asserts that KT4's attempt to circumvent this deficiency by lashing its eleventh-hour valuation purpose to the suspected wrongdoing it identified in its Demand is unavailing because investigating wrongdoing and valuation are two distinct purposes. I agree with Palantir.

"The requirement that the corporation receive an inspection demand in proper form recognizes the importance of striking an appropriate balance between the rights of stockholders and corporations."[91] And the language of Section 220 setting forth the inspection prerequisites is unambiguous.[92] "Accordingly, Delaware courts require strict adherence to the Section 220 inspection demand procedural requirements" and the demand must be in "*proper form before litigation is initiated*."[93] "Delaware law does not permit section 220 actions based on an

---

[90] Def.'s Post-Trial Opening Br. 38.

[91] *Cent. Laborers Pension Fund*, 45 A.3d at 144.

[92] *Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *1 (Del. Ch. Feb. 27, 2017).

[93] *Cent. Laborers Pension Fund*, 45 A.3d at 144, 146 (emphasis in original).

23

ephemeral purpose, nor will this court impute a purpose absent the plaintiff stating one."[94]

In *Seinfeld*, this court held that a stockholder failed strictly to comply with Section 220 because the stockholder's demand omitted certain key words that were deemed necessary to ensure that the demand clearly communicated what the stockholder was looking for and why.[95] Similarly, the Demand is missing certain key words—a stated valuation purpose—and KT4's request for financial materials in furtherance of other stated purposes cannot fill the gap. I cannot infer a valuation purpose from an item in a list of document requests that KT4 states are necessary to advance its *investigative* purpose simply because KT4 now seeks to slap a Band-Aid on a glaring defect in its Demand.

KT4's two additional theories for why the Demand has stated a valuation purpose fail as a matter of law. First, KT4 calls upon *Compaq Computer Corp. v. Horton* for the proposition that if I doubt (as I do) whether the Demand states a valuation purpose, I must resolve my doubt in favor of KT4's statutory right to inspection.[96] KT4's reliance on *Compaq* is misplaced. There, the only question

[94] *W. Coast Mgmt. & Capital, LLC*, 914 A.2d at 646.

[95] *Seinfeld*, 873 A.2d at 317 (noting that the "statute is both clear and commanding" and that "it is not too much to ask of a stockholder or his lawyers to read the statute and comply with its plain provisions when making a demand").

[96] *Compaq Computer Corp. v Horton*, 631 A.2d 1, 3 (Del. 1993) ("Under Section 220, when a stockholder complies with the statutory requirements as to form and manner of

before this court and ultimately appealed to the Supreme Court was whether the stockholder's stated purpose was a proper purpose.[97]  The stockholder in *Compaq* had complied with the statutory requirements under Section 220.[98]  Indeed, KT4's selective citation to *Compaq* ignores that the Court had already recognized that the stockholder had complied with Section 220's form and manner requirements and, therefore, focused its analysis on whether the stockholder had stated a proper purpose.[99]  Here, I cannot reach the propriety of KT4's purported valuation purpose because it did not express that purpose in its Demand as required.

KT4's final proffered basis upon which I may read a valuation purpose into the Demand is likewise flawed.  KT4 argues the Demand's lack of specificity about KT4's valuation purpose was "cured" when it expressly stated a valuation purpose in the Complaint, and then reiterated that stated purpose in Abramowitz's deposition and trial testimony.[100]  To support its contention, KT4 cites numerous Delaware cases where this Court granted inspection after a stockholder offered

---

making a demand, then the corporation bears the burden of proving that the demand is for an improper purpose.  If there is any doubt, it must be resolved in favor of the statutory right of the stockholder to have an inspection.") (citations omitted).

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] Pl.'s Post-Trial Opening Br. 26.

evidence to support its stated purposes.[101] These precedents are inapposite. As

Palantir aptly points out, in every case KT4 cites, the stockholder stated a purpose

in its initial demand for inspection and then supplemented or clarified the stated

purpose during the course of litigation.[102] KT4 missed step one; it failed to state a

valuation purpose in any form in its Demand.

For these reasons, I conclude that KT4 has not stated a valuation purpose.

Having found KT4 has not stated a valuation purpose, I do not reach the issue of

whether KT4's valuation purpose, had it been stated, is a pretext.

## B. The Investigative Purpose

It is well established that a stockholder's desire to investigate waste,

wrongdoing or mismanagement is a proper purpose.[103] But stockholders are only

permitted to investigate wrongdoing to the extent that wrongdoing affects their

interests as stockholders.[104] If that connection exists, then the stockholder meets its

burden of proof when he presents a credible basis from which the court can infer

that waste or wrongdoing may have occurred.[105] This "credible basis" is "some

---

[101] *Id.* at 26–27.

[102] Def.'s Post-Trial Opening Br. 39.

[103] *Seinfeld*, 909 A.2d at 121; *La. Mun. Police Empls.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *2 (Del. Ch. Oct. 5, 2012).

[104] *La. Mun. Police Empls.' Ret. Sys.*, 2012 WL 4760881, at *2.

[105] *Thomas & Betts Corp.*, 681 A.2d at 1031.

evidence" of possible wrongdoing as would warrant further investigation of the matter.[106] In other words, a stockholder "must make a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[107] "The 'credible basis' standard sets the lowest possible burden of proof."[108] "The only way to reduce the burden of proof further would be to eliminate any requirement that a stockholder show some evidence of possible wrongdoing."[109]

The Demand states KT4 seeks books and records "to investigate fraud, mismanagement, abuse, and breach of fiduciary duty,"[110] an accepted proper purpose if it is the primary purpose and not a pretext.[111] In this regard, Palantir argues that investigating wrongdoing is not KT4's primary purpose. Rather,

---

[106] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997) (citing *Helmsman Mgmt. Servs. v. A & S Consultants, Inc.*, 525 A.2d 160, 165–66 (Del. 1987)).

[107] *La. Mun. Police Empls.' Ret. Sys.*, 2012 WL 4760881, at *3 (citing *Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *6 (Del. Ch. Feb. 12, 2009), *aff'd*, 977 A.2d 899 (Del. 2009) (citations omitted)).

[108] *Seinfeld*, 909 A.2d at 123.

[109] *La. Mun. Police Empls.' Ret. Sys.*, 2012 WL 4760881, at *2 (citing *Seinfeld*, 909 A.2d at 123).

[110] JX 170 (Demand) at 4.

[111] *Seinfeld*, 909 A.2d at 121; *Thomas & Betts Corp.*, 681 A.2d at 1030 n.1 ([T]he shareholder's primary purpose must be proper; any secondary purpose, whether proper or not, is irrelevant."); *La. Mun. Police Empls.' Ret. Sys.*, 2012 WL 4760881, at *2.

Palantir urges the Court to conclude that KT4's inspection demand is motivated by Abramowitz's personal interests unrelated to KT4's interests as a stockholder—*i.e.*, obtaining leverage against Palantir in the California Action and obtaining pre-suit discovery on his breach of contract and tortious interference claims against Palantir.[112] According to Palantir, Abramowitz "disavowed any interest in contacting other shareholders"[113] and testified at trial that he is not going to hold onto KT4's Palantir shares to pursue fiduciary duty litigation against Palantir managers.[114] It is also telling, according to Palantir, that Abramowitz never requested any of the information he now seeks when he enjoyed unique access to Palantir offices and executives.

I agree with Palantir that some of KT4's stated purposes reflect Abramowitz's personal desire to gain either litigation leverage or advanced discovery in litigation that he intends to pursue on his own behalf unrelated to his interests as a stockholder. These are not proper purposes. With that said, KT4 has sustained its burden of demonstrating a credible basis of wrongdoing in certain respects that do affect its interests as a Palantir stockholder. I explain the distinction below.

---

[112] Def.'s Post-Trial Opening Br. 26–37.

[113] *Id.* 34.

[114] Tr. 87–88; Def.'s Post-Trial Opening Br. 41.

At the outset, I find unpersuasive Palantir's argument that KT4's investigative purpose is not its primary purpose simply because Abramowitz has "disavowed" any interest in contacting other stockholders or bringing a breach of fiduciary duty suit against Palantir managers. At his deposition, Abramowitz testified that he had not discussed the allegations in the Complaint with any Palantir investors outside of individuals affiliated with the company.[115] This is a far cry from acknowledging that he has no plans to communicate with other stockholders about any of the alleged wrongdoing for which he has requested inspection should he receive those documents.

I also find no merit in Palantir's argument that KT4's investigative purpose is not its primary purpose because Abramowitz did not commit to pursue breach of fiduciary duty litigation after he received the books and records he seeks here.[116] In this regard, Palantir's reliance upon *West Coast Management & Capital, LLC v. Carrier Access Corp.* is puzzling.[117] In *West Coast Management*, this court denied inspection to investigate breaches of fiduciary duty because the plaintiff was *precluded* from taking a second bite at derivative litigation, and plaintiff's sole purpose for launching the Section 220 action was to obtain additional information

---

[115] D.I. 59 (Tr. of Dep. of Abramowitz) at 62.

[116] Tr. 86–88.

[117] 914 A.2d 636 (Del. Ch. 2006).

to re-plead demand futility.[118]  In contrast, as best I can tell, KT4 is not precluded from bringing claims against Palantir; it has simply not committed to do so at this time.  In one sense, KT4 could be commended for not committing to launch litigation against Palantir before it sees the documents it has requested.  While I am by no means ascribing this degree of forethought to KT4's ambivalence, I cannot conclude that KT4 must commit to initiate litigation as a precondition to receiving Section 220 documents.  It is enough that it will consider doing so if evidence of wrongdoing is discovered.[119]

Finally, I reject the notion that KT4's desire for information must be pretextual because KT4 never requested the information it now seeks when Abramowitz enjoyed unique access to Palantir.[120]  In part, at least, Palantir's argument reveals its own fallacy—there was no need to demand inspection when the information from Palantir was free-flowing.  Now that the information stream has dried up, KT4 must resort to more formal methods to obtain information.

---

[118] *W. Coast Mgmt. & Capital*, 914 A.2d at 646.

[119] *Elow v. Express Scripts Hldg. Co.*, 2017 WL 2352151, at *6 n.73 (Del. Ch. May 31, 2017) (noting plaintiff's testimony that he is "merely 'considering' derivative litigation as an option" and rejecting the premise that a "stockholder would need to know prior to an inspection whether he or she definitively will pursue litigation no matter what the documents revealed").

[120] Def.'s Post-Trial Opening Br. 10–11.

Having set aside Palantir's "pretext purpose" arguments, I turn next to the evidence KT4 has presented to determine whether credible bases of wrongdoing exist to warrant further inspection. KT4 presents seven allegations of wrongdoing that it seeks to investigate: (1) Palantir's failure to hold annual stockholder meetings; (2) the adoption of the September 2016 IRA Amendments; (3) violations of the FRCSA and IRA; (4) DTA's compensation; (5) interference with the Brooklands transaction; (6) failure to return liquidity to stockholders and (7) excessive CEO compensation. I address the sufficiency of Plaintiff's proffered evidence in support of each allegation in turn.

### 1. Failure to Hold Annual Stockholder Meetings

KT4 seeks to investigate Palantir's routine failure to hold annual stockholder meetings, in contravention of the Delaware General Corporation Law and Palantir's bylaws.[121] This investigation is reasonably related to KT4's (and others') interests as a Palantir stockholder for the obvious reason that stockholders need and are entitled to receive information about their investment. Stockholders of privately held corporations, such as Palantir, cannot turn to mandated public filings to obtain information about the companies in which they invest. Normally, a corporation

---

[121] Pl.'s Post-Trial Opening Br. 29; 8 *Del. C.* § 211; JX 204 (Palantir Bylaws) § 2 ("The annual meeting of stockholders shall be held each year on a date and a time designated by the Board of Directors.").

shares information about its current and projected operations and performance with stockholders, if not at other times, at least at the company's annual stockholder meeting.[122]

Palantir's serial failure to convene annual stockholder meetings is problematic. Palantir admits that it has not held stockholder meetings, but states that there is no wrongdoing because stockholders have elected to act, instead, by written consent.[123] Even so, the questions remain whether and to what extent KT4 and other stockholders have been (or have not been) provided an opportunity to participate in decision making by written consent and whether all stockholders have been provided with the kind of basic information they could expect to receive from Palantir at an annual stockholder meeting.[124] Accordingly, I find that KT4 has met its low burden of demonstrating a credible basis to suspect wrongdoing as to Palantir's failure to hold annual stockholder meetings.

---

[122] *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *5 (Del. Ch. Apr. 28, 2004) (holding that a company's failure to convene an annual stockholder meeting for over three years alone constitutes a violation of Delaware statutory law and provides a credible basis that mismanagement may have occurred).

[123] JX 183 (Answer to Complaint) at 35.

[124] *See* JX 170 (Demand) (Requests 3 and 4 seek basic information such as the identities and positions of Palantir's officers and directors).

## 2. The September 2016 IRA Amendments

Not only does Palantir not provide its stockholders with information at annual stockholder meetings, it appears from the evidence that Palantir has both prospectively and retroactively foreclosed certain stockholders' contractual rights to obtain information about Palantir. Palantir's September 2016 IRA Amendments eviscerated KT4's (and other similarly situated stockholders') contractual information rights after KT4 sought to exercise those rights.[125] Investigating this potential wrongdoing is undeniably related to KT4's interest as a stockholder.

I find there is a credible basis to suspect wrongdoing in connection with the September 2016 IRA Amendments. In *Marmon*, this Court dealt with an analogous situation. There, the company did not convene an annual stockholder meeting for over three years, yet during this period, the company engaged in several rounds of financing and purposefully withheld this information from the plaintiff and certain other stockholders.[126] The company explained that its certificate of incorporation and other agreements contractually barred it from disclosing information to

---

[125] *See* JX 163 (Information Request); JX 165 (September 2016 IRA Amendment-A) ¶ 1; JX 166 (September 2016 IRA Amendment-B) ¶ 1(a)–(b); Def.'s Post-Trial Opening Br. 17–18.

[126] *Marmon*, 2004 WL 936512, at *5.

33

stockholders who held less than specified levels of equity in the company.[127]  Given these facts, the court held:

> The directors of a Delaware corporation have a duty to disclose material facts to *all* of the corporation's shareholders.  The directors are not free arbitrarily to pick and choose the shareholders to whom they will or will not make disclosure.  Nor can the corporation be heard to defend such a practice on the basis that it has bound itself contractually not to make such disclosures.[128]

Credible basis is a low standard.  The similarities between the facts here and in *Marmon* support KT4's contention that a credible basis exists to suspect wrongdoing with respect to the September 2016 IRA Amendments.

Moreover, the circumstantial evidence surrounding the September 2016 IRA Amendments provides a further credible basis to infer potential wrongdoing. Palantir explains it executed the September 2016 IRA Amendments because Abramowitz requested broad swaths of confidential information after Palantir accused him of theft of trade secrets.[129]  Had Palantir been primarily concerned with Abramowitz obtaining confidential information, it could have denied certain requests and at least made an effort to provide information regarding the non-sensitive topics.  Instead, Palantir led KT4 to believe that it was considering KT4's

---

[127] *Id.*

[128] *Id.* (emphasis in original).

[129] Def.'s Post-Trial Opening Br. 12.

information request, and then pulled the rug out from under KT4 (and other similarly situated stockholders) eleven days later by eviscerating its contractual right to seek information. To be clear, I am not reaching the merits of KT4's allegations regarding Palantir's conduct in amending the IRA.[130] That question is not before me here. I am simply finding that KT4 has demonstrated a credible basis to suspect wrongdoing that merits investigation.

### 3. Notice of Stock Transactions and the Opportunity to Exercise ROFR, Co-Sale and ROFO Rights Under the FRCSA and IRA

KT4 seeks to investigate possible wrongdoing in connection with Palantir's alleged violation of certain stockholders' contractual rights under the FRCSA and IRA. KT4 and other Palantir stockholders are signatories to the FRCSA. Accordingly, wrongdoing relating to contractual rights as set forth in the FRCSA and IRA are matters reasonably related to KT4's interests as a stockholder.

The FRCSA gives KT4 and other stockholders a right to receive notice when a Selling Investor sells shares.[131] The notice requirement gives stockholders the opportunity to exercise a ROFR over the Selling Investor's shares and the right to

---

[130] I am aware of Palantir's position that Section 3.7 of the IRA permits Palantir to amend or waive generally or in particular instances, either retroactively or prospectively, certain other IRA provisions. JX 3 (June 2006 IRA) § 3.7; JX 6 (February 2008 IRA) § 3.7; JX 87 (July 2015 IRA) § 3.7.

[131] JX 1 (June 2006 FRCSA) §§ 2.1(a), 2.1(c); JX 7 (February 2008 FRCSA) §§ 2.1(a), 2.1(c); JX 86 (July 2015 FRCSA) §§ 2.1(a), 2.1(c); Pl.'s Post-Trial Opening Br. 32.

sell its shares alongside the Selling Investor.[132] KT4 has established a credible basis that Palantir may have violated the FRCSA. Karp, a Selling Investor, owned 61 million shares of common stock in 2009.[133] As of January 2017, however, Karp owns approximately 40 million shares.[134] Although this difference remains unexplained in the record, the difference alone is at least some evidence that Palantir allowed Karp to sell his shares without allowing parties to the FRCSA to exercise their ROFR or sell their shares along with Karp. Additionally, three other Selling Investors also transferred substantial shares between 2009 and 2017.[135] Abramowitz testified that KT4 did not receive notice of these stock transactions, nor was KT4 provided the opportunity to exercise its ROFR and co-sale right.[136]

Palantir argues that KT4 has not provided evidence that the shares Karp sold are subject to a co-sale right, especially given that the July 2015 FRCSA excludes

---

[132] JX 1 (June 2006 FRCSA) §§ 2.1(d), 2.2; JX 7 (February 2008 FRCSA) §§ 2.1(d), 2.2; JX 86 (July 2015 FRCSA) §§ 2.1(d), 2.2; Pl.'s Post-Trial Opening Br. 32.

[133] JX 404 (Palantir Series D Preferred Stock Purchase Agreement, Dated November 17, 2009) at 1731.

[134] JX 194 (Palantir Stocklist, Dated January 31, 2017) at 209.

[135] In addition to Karp: (1) one individual held 46.5 million shares in 2009, but zero shares in 2017; (2) another individual held 21.6 million shares in 2009 and 18.5 million shares in 2017; and (3) a third individual held 49 million shares in 2009 and 16 million shares in 2017. JX 404 (Palantir Series D Preferred Stock Purchase Agreement, Dated November 17, 2009) at 1731; JX 194 (Palantir Stocklist, Dated January 31, 2017) at 224–25, 228.

[136] Tr. 105; Pl.'s Post-Trial Reply Br. 36.

KT4.[137] Like a ship passing in the night, in response to Palantir's arguments, KT4 cites to the February 2008 FRCSA instead of, and without acknowledging, the July 2015 FRCSA.[138] Even so, Palantir's position is flawed for two reasons.

First, Palantir is challenging the merits of KT4's FRCSA claim even though, at this stage, "I cannot analyze the strength of the potential underlying claim[]."[139] Second, even if the July 2015 FRCSA governs KT4's rights, as Palantir argues, that agreement does not definitively shut down KT4's allegation of wrongdoing. Specifically, at Section 2.4, the July 2015 FRCSA states that ROFO and co-sale rights do not apply to transfers by Selling Investors that are "approved by a disinterested majority of the Board of Directors of [Palantir]" and do not exceed the exemptions identified in Schedule B.[140] Schedule B explicitly indicates "zero" when referencing Karp's common stock that is excluded from the ROFR and co-

---

[137] Def.'s Post-Trial Opening Br. 54. I acknowledge Palantir's position that Section 10 of the FRCSA permits Palantir to amend or waive the FRCSA both retroactively or prospectively. JX 1 (June 2006 FRCSA) § 10; JX 7 (February 2008 FRCSA) § 10. KT4 has not raised the issue of whether the FRCSA was properly amended so I need not reach the merits of this argument.

[138] *See* Pl.'s Post-Trial Reply Br. 37.

[139] *Elow*, 2017 WL 2352151, at *6; *Marmon*, 2004 WL 936512, at *6 ("The pretext under which the company sought to litigate a 'merits' defense to this claim to inspect books and records in order to investigate possible mismanagement, is that there can be no 'credible' evidence of mismanagement if, in fact, no mismanagement ever occurred. This gambit, if allowed, would turn on its head both § 220 and the case law upholding a books and records inspection for the purpose of investigating mismanagement.").

[140] JX 86 (July 2015 FRCSA) § 2.4.

sale right.[141]  Thus, the ROFR and co-sale right could apply to Karp's Palantir stock. Also, Schedule B exempts 3.5 million shares of another Selling Investor's stock, but the record suggests that this Selling Investor may have transferred far more than 3.5 million shares.[142]

Establishing a credible basis merely requires some evidence.  With this standard in mind, I find some evidence of wrongdoing with respect to the FRCSA. Karp appears to have transferred shares of Palantir stock.  Even if Karp's transfer(s) were permissible, one of the other Selling Investors' transfer(s) appears to have exceeded the exemptions established in the July 2015 FRCSA.

KT4 also seeks to investigate wrongdoing as relates to its notice right and the ROFO under the IRA.  The IRA obligates Palantir to give KT4 and certain other stockholders notice and the ROFO on subsequent rounds of financing. [143] Accordingly, this investigation, similar to the FRCSA investigation, is reasonably related to KT4's interest as a stockholder.

---

[141] JX 86 (July 2015 FRCSA) § 2.4, Schedule B.

[142] *Id.* JX 404 (Palantir Series D Preferred Stock Purchase Agreement, Dated November 17, 2009) at 1731; JX 194 (Palantir Stocklist, Dated January 31, 2017) at 224–25, 228.

[143] JX 3 (June 2006 IRA) § 2.4; JX 6 (February 2008 IRA) § 2.4; JX 87 (July 2015 IRA) § 2.4; Pl.'s Post-Trial Opening Br. 33.

Abramowitz testified that he last received notice of a round of financing when Palantir issued its Series E shares.[144] As of the date of the July 2015 IRA, however, Palantir had issued up to at least Series J preferred stock.[145] One need not strain to divine that several letters of the alphabet have gone missing between the last financing of which KT4 received notice and Palantir's most recent funding rounds.

Palantir again responds with the "merits" defense that KT4 has not demonstrated that its rights were not waived or amended by the September 2016 IRA Amendment, whereby the Major Investor threshold was increased from 5 million to 10 million shares.[146] According to Palantir, following the September 2016 IRA Amendment, KT4 no longer qualifies as a Major Investor and therefore no longer is entitled to receive notice of Palantir stock offerings.[147] That defense may ultimately carry the day should KT4 assert a breach claim relating to the IRA. For now, however, KT4 has established a credible basis to investigate Palantir's compliance with the IRA in regard to providing stockholders with notice and the opportunity to exercise the ROFO.

---

[144] Tr. 73–74.

[145] JX 87 (July 2015 IRA) at 85.

[146] JX 165 (September 2016 IRA Amendment-A) ¶ 1; Def.'s Post-Trial Opening Br 55.

[147] Def.'s Post-Trial Opening Br. 55.

### 4. DTA's Compensation

KT4 next states it requires books and records to investigate wrongdoing in connection with Palantir's relationship with DTA. Specifically, KT4 seeks to investigate whether Palantir has committed waste in its compensation of DTA. Investigating potential waste that impacts a corporation's bottom line is reasonably related to one's interest as a stockholder. Therefore, I am satisfied that KT4's interest in investigating this issue is not personal to KT4 nor otherwise pretextual.

KT4 points to evidence that DTA holds over 19 million shares of Palantir stock, "worth roughly '$100 to $250 million' on the secondary market," as a credible basis to suspect potential waste.[148] KT4 also highlights six Securities and Exchange Commission filings ("Form Ds") where Palantir reports significant "Sales Compensation" to S F Sentry Securities, Inc. ("S F Sentry") and another broker.[149] KT4 proffers (with no corroboration) that DTA is a firm operating under the license of S F Sentry and, on that basis, seeks to attribute the sales compensation identified on the Form Ds to DTA.[150] Even under the credible basis standard, KT4's

---

[148] JX 194 (Palantir Stocklist, Dated January 31, 2017) at 215–16; Tr. 70–71; Pl.'s Post-Trial Br. 34.

[149] JX 314–19 (Form Ds); Pl.'s Post-Trial Opening Br. 34–35.

[150] Tr. 53. KT4 erroneously harps on Palantir's admission that the Form Ds disclosed the amount of compensation to DTA working under the license of S F Sentry. Pl.'s Post-Trial Reply Br. 45. Palantir made no such admission. Defendant's Post-Trial Opening Brief merely states, "Palantir publicly disclosed the value of sales commissions and finders'

evidence of waste falls short of the mark. Abramowitz testified that he had no basis to support the contention that the 19 million shares held by DTA were obtained as compensation from Palantir, and yet that is precisely what KT4 seeks to investigate.[151] The lack of any evidence on this issue is reflective of the kind of speculation and idle curiosity that cannot form a credible basis to investigate.[152]

### 5. Interference with the Brooklands Transaction

Most of KT4's trial presentation related to its contention that Palantir and its agents wrongfully interfered with the Brooklands transaction. Abramowitz has made no bones about the fact that he intends to bring a tortious interference claim (at least) against those allegedly responsible for blocking the sale of KT4's Palantir stock to Brooklands.[153] Any wrongdoing relating to the Brooklands transaction would arise out of a contract that Abramowitz allegedly formed with a prospective purchaser of KT4's Palantir stock, and the damages would be uniquely KT4's (or

---

fees associated with offerings of its stock on its Form D filings." Def.'s Post-Trial Opening Br. 60.

[151] Tr. 70–71.

[152] *Sec. First Corp.*, 687 A.2d at 565 (holding that Section 220 is not a vehicle from which to launch a fishing expedition).

[153] Tr. 125–31.

Abramowitz's).[154]  This is quintessentially a claim personal to Abramowitz that is not related to KT4's interests as a stockholder.[155]  It cannot form the basis of a proper purpose to assert inspection rights under Section 220. [156]

### 6.  Lack of Liquidity to Stockholders

KT4 seeks to investigate Palantir's failure to return liquidity to stockholders via dividend issuance, an IPO or a merger.  Obtaining liquidity is related to one's interests as a stockholder.  The evidence KT4 has presented to support a credible

---

[154] Notably, KT4's demand specifically states it seeks to investigate "whether Palantir . . . improperly interfered with *KT4's* efforts to sell its Palantir shares.") JX 170 (Demand) at 4 (emphasis added).

[155] KT4 argues that it "seeks to investigate the possibility that Palantir and its agents have breached the contractual rights that [Palantir] provides to [KT4] and other shareholders and the possibility that [Palantir] has abused the position it has over shareholder transactions in their shares." Pl.'s Post-Trial Opening Br. 45.  KT4's attempt to broaden the scope of the claims that Abramowitz intends to bring against Palantir by purporting to advance the cause of other stockholders rings hollow and finds no support in the evidence.

[156] *Pogue v. Hybrid Energy, Inc.*, 2016 WL 4154253, at *3 n.16 (Del. Ch. Aug. 5, 2016) (determining plaintiff's purpose of using "the tools at hand to properly bring a 205 action" or to "pursue a breach of contract issue . . . both relate to an *individual* interest," neither of which is a proper purpose) (emphasis in original); *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 165 (Del. Ch. 2006) ("Section 220 is also not a way to circumvent discovery proceedings, and is certainly not meant to be a forum for the kinds of wide-ranging document requests permissible under Rule 34."); *Berkowitz v. Legal Sea Foods, Inc.*, 1997 WL 153815, at *2 (Del. Ch. Mar. 24, 1997) (denying inspection where plaintiff's primary purpose for seeking inspection was to facilitate the prosecution of an action that enforces and vindicates plaintiff's individual interests); *Cent. Laborers Pension Fund v. News Corp.*, 2011 WL 6224538, at *1 (Del. Ch. Nov. 30, 2011) ("Section 220 was not adopted as a substitute for litigation discovery.").  *See also* Post-Trial Oral Arg. Tr. 52–53 (KT4's counsel concedes tortious interference claim likely not a proper purpose under Section 220).

basis to infer wrongdoing in this respect is thin, however, and does not meet the low credible basis standard. KT4 offers no evidence of Palantir's wrongdoing as to a lack of dividends; it stands on its bald accusation that Palantir's failure to return dividends is *per se* wrong. I am aware of nothing in the evidentiary record (*e.g.*, stockholder agreements, etc.) or in Delaware law that would support that position. The evidence surrounding wrongdoing related to Palantir's failure to conduct an IPO is likewise missing. On this point, KT4 claims the wrongdoing lies in Karp and Palantir's other founders' self-interested decision to keep Palantir private to preserve their own stake in the "lucrative state of affairs."[157] As evidence, KT4 relies on a news article that states a reason Palantir is competitive is because it "refuses to go public."[158] This "evidence" is insufficient to establish a credible basis of any wrongdoing.

KT4 points to Abramowitz' testimony regarding a potential merger opportunity and four emails as a credible basis to infer that Palantir wrongfully bypassed an opportunity to be acquired.[159] That "evidence" is really no evidence at all. Rather, the "evidence" of the purported merger opportunity is nothing more

---

[157] Pl.'s Post-Trial Reply Br. 54.

[158] JX 41 (News Article).

[159] Tr. 78–79, 153–54; JX 135 (E-mail); JX 138 (E-mail); JX 143 (E-mail); JX 159 (E-mail).

than Abramowitz's testimony that he arranged a meeting between Palantir management and Oracle's CEO to discuss a potential deal, but Abramowitz acknowledged that he was not involved in any further discussions beyond the initial meet and greet lunch.[160] He cannot say, therefore, what happened from there and certainly cannot point to any evidence that Palantir did anything improper to avoid the transaction.

The four E-mails upon which Abramowitz relies as evidence of wrongdoing fare no better. Two of the E-mails are vague and non-descript communications between Abramowitz and another Palantir stockholder.[161] The third E-mail is equally cryptic and appears simply to confirm the lunch meeting.[162] The fourth E-mail makes reference to "our project" but makes no reference to merger negotiations in any manner.[163] None of this "evidence" provides a credible basis to suspect wrongdoing regarding any aspect of Palantir's alleged failure to return liquidity to stockholders.

---

[160] Tr. 153–54.

[161] JX 135 (E-mail); JX 159 (E-mail).

[162] JX 138 (E-mail).

[163] JX 143 (E-mail).

### 7. Palantir's CEO Compensation

Finally, KT4 seeks to investigate potential wrongdoing as to KT4's compensation of its officers and directors and, in this regard, specifically singles out Karp's compensation. Waste, such as excessive executive compensation, impacts a corporation's bottom line and therefore is reasonably related to one's interest as a stockholder. Nevertheless, here again, KT4 has failed to establish a credible basis to infer wrongdoing as relates to Palantir's executive compensation.

KT4 suspects wrongdoing because Karp worked at a nonprofit before joining Palantir, yet he now owns 60 million shares of Palantir stock and allegedly has a net worth of $1.6 billion.[164] KT4's evidence of Karp's net worth is, at best, questionable and, standing alone, hardly amounts to a credible basis to suspect waste.[165] Abramowitz and Karp have fallen out; that is not a reason to investigate Karp's compensation.

### C. Scope of Inspection

Where a stockholder seeks to inspect a corporation's stock ledger or stocklist, and the stockholder has complied with the required form and manner of making a demand for inspection of these documents, the corporation bears the burden of

---

[164] JX 404 (Palantir Series D Preferred Stock Purchase Agreement, Dated November 17, 2009) at 1731.

[165] Tr. 89–91; JX 179 (Video); JX 404 (Palantir Series D Preferred Stock Purchase Agreement, Dated November 17, 2009) at 1731; Pl.'s Post-Trial Reply Br. 55–56.

proving that the stockholder seeks these documents for an improper purpose.[166]

Because I have found KT4 has a proper investigative purpose, albeit limited to certain alleged wrongdoing, KT4 is entitled to inspect the stock ledger and stocklist.

I have determined that the Demand states a proper purpose and demonstrated a credible basis to investigate potential wrongdoing concerning Palantir's failure to hold annual stockholder meetings, the September 2016 IRA Amendments, and breach of the ROFR, co-sale right and ROFO in the FRCSA and IRA. Accordingly, KT4 is entitled to inspect books and records that are essential to fulfill those investigative purposes.[167]

As to the scope of inspection, "the trial court has wide latitude in determining the proper scope of inspection," and "[u]ndergirding this discretion is a recognition that the interests of the corporation must be harmonized with those of the inspecting stockholder."[168] Accordingly, this Court must order inspection that is carefully tailored and "circumscribed with rifled precision."[169] Documents sought must be unavailable from any other source and integral—necessary and essential—to KT4's

---

[166] 8 *Del. C.* § 220(c).

[167] *Thomas & Betts Corp.*, 681 A.2d at 1035.

[168] *Id.*

[169] *Sec. First Corp.*, 687 A.2d at 565, 570. *See also Thomas & Betts Corp.*, 681 A.2d at 1035 ("The responsibility of the trial court to narrowly tailor the inspection right to a stockholder's stated purpose is well established.").

proper purpose(s).[170] A document is "essential" if "it addresses the crux of the shareholder's purpose."[171] "The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other or further relief as the Court may deem just and proper."[172]

KT4 made 22 Requests in its Demand. I am satisfied that, of those Requests, Palantir must allow inspection with respect to the following information that relate directly to the proper purposes for inspection advanced by KT4.

## 1. Lack of Annual Stockholder Meetings

KT4 has set forth a credible basis to suspect wrongdoing as to Palantir's failure to hold annual stockholder meetings. Palantir stockholders, KT4 included, deserve basic information about their investments. To that end, KT4 is entitled to books and records responsive to its Requests, as modified here: (a) the identities of directors and officers, and their dates of service from 2011 through the present (Requests 3 and 4) and (b) books and records relating to Palantir's annual stockholder meetings, as described in Request 20. Palantir will also provide information responsive to Request 6, from 2011 through the present. I decline to

---

[170] *See Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1277–78 (Del. 2014).

[171] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371 (Del. 2011) (citations omitted).

[172] 8 *Del. C.* § 220(c).

grant KT4 inspection of the document(s) sought in Request 13 because the record evidence does not identify what this document is or how it relates to KT4's stated purpose of investigating wrongdoing relating to annual stockholder meetings.[173]

### 2. September 2016 IRA Amendments

KT4 has established a credible basis to suspect wrongdoing to investigate the September 2016 IRA Amendments. Accordingly, KT4 is entitled to books and records related to the September 2016 IRA Amendments as identified in Request 19.[174] To be clear, KT4 is not entitled to books and records relating to "any" IRA amendment since 2011. Those documents, if they exist, are not at issue here.

### 3. ROFR, Co-Sale Right and ROFO Under the FRCSA and IRA

Finally, KT4 has established a credible basis to suspect wrongdoing relating to Palantir's alleged violations of its stockholder agreements by failing to provide KT4 (and similarly situated stockholders) with notice and an opportunity to exercise ROFR and co-sale rights under the FRCSA and ROFO under the IRA. KT4 is thus

---

[173] Request 13 states, in full: "all books and records relating to the Corporation's 'practices and policies' concerning sales of Palantir shares, as referenced in an email from Kevin Kawasaki to Stephen Brown dated January 11, 2016." JX 170 (Demand) at 2.

[174] In the event Palantir chooses not to re-produce the September 2016 IRA Amendments that it produced in this litigation, KT4 may use the September 2016 IRA Amendments as produced in this litigation, but subject to the confidentiality agreement that will govern the books and records KT4 receives as a result of this Memorandum Opinion.

entitled to inspect (a) Palantir's stock ledger (Request 1); (b) Palantir's stocklist that is as current as reasonably possible (Request 2); (c) books and records relating to each Founder's (as that term is defined in JX 1 and JX 7) actual and potential sales of shares of, or securities convertible into or exchangeable for any shares of, Palantir capital stock from 2011 through the present (Request 11, with modifications) and (d) each notice that Palantir sent to any person or entity who was then a Major Investor for each offering or sale of shares of, or securities convertible into or exchangeable or exercisable for any shares of, Palantir capital stock subsequent to its Series E Preferred Stock issuance (as defined in JX 87) (Request 14, with modifications).

### D. Confidentiality Treatment

It is customary for a final order under Section 220 to be conditioned upon a reasonable confidentiality agreement.[175] The parties are to confer in good faith to negotiate a confidentiality order. The documents to be produced in response to the Demand shall be subject to the terms of that order.

### III. CONCLUSION

For the foregoing reasons, judgment shall be entered in favor of KT4 that directs Palantir to allow inspection of books and records in accordance with this

---

[175] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 820 (Del. Ch. 2007).

Memorandum Opinion, subject to a confidentiality order. The parties shall confer and submit an implementing order and final judgment within ten (10) days.